**IN THE UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN GALVAN, | ) | Case No. 23 CV 3158 |
| | ) | Honorable Judge Kennelly |
| Plaintiff, | ) | Magistrate Judge Kim |
| | ) | |
| v. | ) | *Coordinated for Pretrial Proceedings with* |
| | ) | *Nañez v. Switski, et al.*, 23 CV 3162 |
| VICTOR SWITSKI, et al., | ) | *Almendarez v. Switski, et al.*, 23 CV 3165 |
| | ) | |
| Defendants. | ) | Jury Trial Demanded |

**INDIVIDUAL CITY DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF
UNDISPUTED MATERIAL FACTS**

Defendants Victor Switski, Leroy Almanza, Marjorie O'Dea, Thomas Jones, Daniel
Centracchio, Tony Jin, Alan Osoba, Aaron Capesius as the Special Representative for the Estate
of James Capesius, and Geri Lynn Yanow as the Special Representative for the Estates of James
Hanrahan, Mark Scheithauer, Ronald Gall, and Jack Lumsden (collectively "Individual City
Defendants")[1] through their attorneys, HALE & MONICO, LLC, respectfully submit this
Statement of Undisputed Material Facts pursuant to Local Rule 56.1 and state:

---

[1] For clarity, the Estates of each deceased officer shall simply be referred to as Defendant (officer last
name).

1

| Exhibit Number | Description |
|---|---|
| 1 | RD #H 422 670 investigative file |
| 2 | Tony Jin deposition |
| 3 | Daniel Centracchio deposition |
| 4 | Salvatore report on Plascencia |
| 5 | Alan Osoba deposition |
| 6 | Chemistry Unit lab report |
| 7 | Crime lab receipt copy |
| 8 | Thomas Jones deposition part 1 |
| 9 | Thomas Jones deposition part 2 |
| 10 | Victor Switski deposition |
| 11 | Marjorie O'Dea deposition |
| 12 | May 30, 1987 GPR from 10th District officers |
| 13 | May 30, 1987 GPR Vega notes |
| 14 | June 1 photographs viewed by Flores |
| 15 | Frank Partida deposition |
| 16 | Leroy Almanza deposition |
| 17 | King Investigative Report |
| 18 | Michael McCormick deposition |
| 19 | June 13, 1988 transcript |
| 20 | September 14, 1988 transcript |
| 21 | October 12, 1988 transcript |
| 22 | March 25, 1988 Galvan trial transcript part 1 |
| 23 | March 25, 1988 Galvan trial transcript part 2 |
| 24 | March 25, 1988 Galvan trial transcript part 3 |
| 25 | March 25, 1988 Galvan trial transcript |
| 26 | March 30, 1988 Galvan trial transcript |
| 27 | January 24, 1990 Almendarez/Nanez trial transcript |
| 28 | January 25, 1990 Almendarez/Nanez trial transcript |
| 29 | January 26, 1990 Almendarez/Nanez trial transcript |
| 30 | Arthur Almendarez deposition |
| 31 | John Galvan deposition |
| 32 | Francisco Nanez deposition |
| 33 | Galvan criminal case summary |
| 34 | Nanez crimnal case summary |
| 35 | Almendarez criminal case summary |
| 36 | Almendarez 2nd supplemental answers to Almanza's interrogatories |
| 37 | Galvan 2nd supplemental answers to Almanza's interrogatories |
| 38 | Nanez 2nd supplemental answers to Almanza's interrogatories |
| 39 | Michael Almendarez deposition |

| 40 | Arthur Almendarez handwritten statement |
| 41 | Michael Almendarez handwritten statement |
| 42 | John Galvan court reported statement |
| 43 | Francisco Nanez court reported statement |
| 44 | Joel Leighton deposition |
| 45 | Photographs of Plaintiffs at Area 4 |
| 46 | Thomas Jones grand jury testimony |
| 47 | Jack Smeeton Nov 13, 2024 deposition |
| 48 | Galvan motion to quash and suppress |
| 49 | June 14, 1988 Galvan hearing |
| 50 | Almendarez motion to quash and suppress |
| 51 | Nanez motion to quash and suppress |
| 52 | January 29, 1990 trial transcript |
| 53 | Photographs of June 8, 1987 lineups |
| 54 | Public Defender copy of September 26, 1986 crime lab report |
| 55 | State's Attorney copy of September 26, 1986 crime lab report |
| 56 | Almendarez signed criminal complaints |
| 57 | Galvan signed criminal complaints |
| 58 | Nanez signed criminal complaints |
| 59 | Indictments |
| 60 | Alan Osoba affidavit |
| 61 | Jack Smeeton January 21, 2025 deposition |
| 62 | Kenneth Fletcher January 28, 2025 deposition |
| 63 | Galvan June 9, 1987 bond order |
| 64 | Almendarez June 9, 1987 bond order |
| 65 | Nanez June 9, 1987 bond order |

## PARTIES AND JURISDICTION

1. During the relevant time, Victor Switski, Leroy Almanza, Marjorie O'Dea, Thomas Jones, Daniel Centracchio, Tony Jin, Alan Osoba, James Capesius, James Hanrahan, Mark Scheithauer, Ronald Gall, and Jack Lumsden were employees of the City of Chicago and acted within the scope of their employment and under color of law. *Defendant Switski's Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 206; 23-cv-3162 Dkt No 143; 23-cv-3165 139)[2]* at ¶¶ 12, 13, 14, 17; *Defendant Almanza's Answer, Affirmative Defenses, and Jury (23-cv-3158 Dkt. No.*

---

[2] The docket numbers identified in this Statement of Fact is the answer for each Individual City Defendant to the operating complaint in each of the three cases.

3

*207; 23-cv-3162 Dkt No. 133; 23-cv-3165 Dkt No. 132)* at ¶¶ 12, 13, 14, 17; *Defendant Capesius Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 208; 23-cv-3162 Dkt No. 134; 23-cv-3165 Dkt No. 133)* at ¶¶ 12, 13, 14, 17; *Defendant Centracchio's Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 209; 23-cv-3162 Dkt. No. 135; 23-cv-3165 Dkt No. 134)* at ¶¶ 12, 13, 14, 17; *Defendant Gall's Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 210; 23-cv-3162 Dkt No. 136; 23-cv-3165 Dkt No. 140)* at ¶¶ 12, 13, 14, 17; *Defendant Hanrahan's Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 211; 23-cv-3162 Dkt No 137; 23-cv-3165 Dkt No. 141)* at ¶¶ 12, 13, 14, 17; *Defendant Jin's Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 212; 23-cv-3162 Dkt No. 138; 23-cv-3165 Dkt No. 135)* at ¶¶ 12, 13, 14, 17; *Defendant Jones' Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 213; 23-cv-3162 Dkt No. 139; 23-cv-3165 Dkt No. 136)* at ¶¶ 12, 13, 14, 17; *Defendant Lumsden's Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 214; 23-cv-3162 Dkt No. 140; 23-cv-3165 Dkt No. 142)* at ¶¶ 12, 13, 14, 17; *Defendant O'Dea's Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 215; 23-cv-3162 Dkt No. 141; 23-cv-3165 Dkt No. 137)* at ¶¶ 12, 13, 14, 17; *Defendant Osoba's Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 216; 23-cv-3162 Dkt No 144; 23-cv-3165 Dkt No. 138)* at ¶¶ 12, 13, 14, 17; *Defendant Scheithauer's Answer, Affirmative Defenses, and Jury Demand (23-cv-3158 Dkt. No. 217; 23-cv-3162 Dkt No. 142; 23-cv-3165 Dkt No. 143)* at ¶¶ 12, 13, 14, 17.[3]

2.      This Court has jurisdiction over all claims in this litigation. *Individual City Defendants' Answers, Affirmative Defenses, and Jury Demand* at ¶¶ 9, 10.

---

[3] Collectively "Individual City Defendants' Answers, Affirmative Defenses, and Jury Demand").

**SEPTEMBER 21, 1986 FIRE AT 2603 WEST 24TH PLACE**

3.      On September 21, 1986, a fire ignited at a residence located at 2603 West 24th Place, Chicago, Illinois. Several individuals were able to escape the residence but two individuals – Juilo Martinez and Gudalupe Martinez – were killed in the fire. *Exhibit 1*[4] at CITY-GALVAN 7588-7592[5]; *Exhibit 2* at 76: 1-21.

4.      This is a Google Earth view of the neighborhood where the September 21, 1986 arson at 2603 West 24th Place occurred. 2603 W. 24th Place is noted with a red box.[6]



---

[4] The reports contained within the Investigative File would be admissible either through the testimony of officers who could authenticate them as past recollection recorded or through testimony of the officers who would summarize the same.

[5] For clarity, these numbers reference the bates numbers in the bottom right hand corner of the document.

[6] Courts within the Northern District of Illinois may take judicial notice of Google Map images for the general purpose of understanding the relative geographic locations referenced by the parties. *See* Fed.R.Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013); *Hicks v. Cook County Sheriff's Office*, No. 15 C 6852, 2020 WL 1322844, at *9 (N.D.Ill. Mar. 19, 2020) (taking judicial notice of image from Google Maps of are where incident occurred). Individual City Defendants request this Court take judicial notice of the Google Maps image in Paragraph 4 under these principles as it allows the Court to understand the general area surrounding the location of the 2603 West 24th Place arson.

5.      Chicago Fire Department personnel responded and were able to extinguish the fire. *Exhibit 1* at CITY-GALVAN 7588-7592; *Exhibit 2* at 75: 1-11.

6.      Bomb and Arson Detective Defendant Scheithauer responded to 2603 W. 24th Place. Defendant Scheithauer interviewed the ground floor resident of the building (Nunez) and documented the interview in his Agg. Arson Supplemental Report. *Exhibit 1* at CITY-GALVAN 7574-7580.

7.      Defendant Scheithauer performed an exterior and interior examination of 2603 W. 24th Place and documented his observations in his report. Defendant Scheithauer collected five quart-size cans of fire debris and submitted it to the Chicago Police Department Crime Lab under Invoice Number 328551. This included the collection of fragments of green glass. *Exhibit 1* at CITY-GALVAN 7574-7580.

8.      Defendant Jin interviewed Jorge Martinez (who had been injured) and Blanca Martinez: siblings to the two deceased individuals. Defendant Jin interviewed Jorge Martinez at the hospital and noted Latin King street gang tattoos on Jorge. Blanca relayed to Detective Jin that she had evicted two tenants approximately three weeks prior to the fire (Jose Santos and Jane Borys). Defendant Jin noted those former tenants in his report. *Exhibit 1* at CITY-GALVAN 7588-7592, 7681-7683; *Exhibit 2* at 90: 8-9, 95: 2-5, 108: 4-21, 101: 2-21.

9.      Defendants Capesius and Centracchio interviewed a woman named Soccoro Flores, who informed the officers that she was in her kitchen at 2612 West Luther (2nd Floor apartment) and heard voices from the alley. One of the voices said "not this house stupid, over there." *Exhibit 1* at CITY-GALVAN 7588-7592, 7679

10.     Flores saw three male Hispanics in their late teens standing near the rear of 2603 W. 24th Place. She observed one of the men holding a contained wrapped in what appeared to be a towel and then throw the object at the rear of 2603 W. 24th Place. This person had "short curly hair." The residence then burst into flames and the three men fled southbound. *Exhibit 1* at CITY-GALVAN 7588-7592, 7679; *Exhibit 3* at 24: 7-24, 53: 14-25, 54: 1.

11.     Defendant Capesius interviewed Dario Trujillo and documented that interview in a General Progress Report ("GPR"). Trujillo stated that he had been drinking with a companion at 2618 W. Luther when he noticed a red 1975-77 sports car with three Hispanic males and one Hispanic female inside, circling the block 6-7 times. Trujillo stated that he went inside his home when, approximately ten minutes later, he hears an explosion and hears Soccoro Flores (his neighbor) yelling "fire." A summary of Tujillo's statement was also included in Defendant Jin's September 21, 1986 report. *Exhibit 1* at CITY-GALVAN 7588-7592, 7680; *Exhibit 3* at 61: 2-18.

12.     Detective Jin, Capesius, and Centracchio were informed of a series of intentionally-set auto fires in the area around 2603 W. 24th Place the same night of the arson. A witness to one of those auto fires had noted a license plate to a vehicle registered to Francisco Plascencia. *Exhibit 1* at CITY-GALVAN 7588-7592, 7599-7602.

13.     On September 21, 1986, Francisco Plascencia was arrested and questioned by Chicago Police Department Bomb and Arson Detective Charles Salvatore as to his actions the night of September 20, 1986 through the morning of September 21, 1986. Francisco Plascencia denied involvement in the arsons and informed Detective Salvatore that he was with two individuals at the time of the fires: John Galvan[7] and Alex Ortiz. Both Galvan and Ortiz were questioned and

---

[7] Spelled John Galvin in Detective Salvatore's report.

7

confirmed Plascencia's alibi for the time of the 2603 W. 24th Place arson. *Exhibit 2* at 122: 6-10; *Exhibit 4* at EP GALVAN 20721-20722.

14.     At 2230 on September 21, 1986, Soccoro Flores viewed a line-up that included Francisco Plascencia and Alejandro Ortiz. Flores did not make a positive identification. *Exhibit 1* at CITY-GALVAN 7586-7587.

15.     Defendant Scheithauer was informed that Flores had made the statement that she observed an individual throw something at the building and flee the scene, with the building then bursting into flames. *Exhibit 1* at CITY-GALVAN 7579.

16.     Defendant Scheithauer drafted his September 22, 1986 report and wrote in his report that fire originated at or near floor level of the first floor porch and the damage inflicted by the fire indicated the probable involvement of a liquid accelerant. Defendant Scheithauer further documented that the were no likely accidental sources of ignition of the fire noted, there was a "virtual absence" of window glass outside the porch area while the bulk of the glass from the windows was located inside the porch, and that the first-floor tenant (Nunez) had stated there were no heat producing devices on the porch. *Exhibit 1* at CITY-GALVAN 7574-7580.

17.     Defendant Scheithauer wrote that "[i]n sum, the physical circumstances indicate that a liquid accelerant was introduced onto the first floor rear porch floor and ignited by unknown means. Local residence suggest or have heard (hearsay) that it was a 'Molotov cocktail'. While a Molotov cocktail would be consistent with the preceding observations, final determinations await both laboratory results and results of the A/4 VC[8] investigation." Defendants Gall and Lumsden "concurred" with Defendant Scheithauer's "findings, observations, and evaluation." *Exhibit 1* at CITY-GALVAN 7574-7580.

---

[8] Area 4 Violent Crime.

## ANALYSIS OF THE DEBRIS COLLECTED FROM 2603 W. 24TH PLACE

18.     In September 1986, Defendant Osoba worked for the Chicago Police Department in the crime laboratory. *Exhibit 5* at 13: 13-17.

19.     Defendant Osoba's duties included the examination and evaluation of submitted samples to determine their chemical identity. For arson investigations, Defendant Osoba would examine debris samples to determine if ignitable liquids are detectable. *Exhibit 5* at 14: 1-5.

20.     Defendant Osoba analyzed the five samples submitted by Defendant Scheithauer. The results were that no ignitable liquids were found on the five samples. *Exhibit 5* at 15: 16-22.

21.     Defendant Osoba completed a Laboratory Report on September 26, 1986 that stated "no identifiable accelerant was detected." That report was produced to the Cook County State's Attorney's Office and the Cook County Public Defender's Office. *Exhibit 5* at 38: 14-22; *Exhibit 6* at CITY-GALVAN 8114; *Exhibit* 54 (*Cook County Public Defender's Office copy of September 26, 1987 Laboratory Report*); *Exhibit 55* (*Cook County State's Attorney's Office copy of September 26, 1987 Laboratory Report*).

22.     After his analysis was completed, Defendant Osoba visually inspected the contents of the five cans of fire debris and wrote a note on the Crime Laboratory Division Receipt for Exhibits document, identifying the physical evidence. One of the cans contained green and clear glass fragments, which Defendant Osoba believed was too thick to be a bottle fragment and the thickness would have been more consistent with a plate or ashtray. *Exhibit 5* at 31: 10-19, 33: 2-11, 40: 1-15, 42: 2-14; *Exhibit 7* at CITY-GALVAN 8116.

23.     Once the analysis was completed, the reports for the Crime Laboratory would be signed. A copy of the September 26, 1986 Laboratory Report would be provided to the detective. The Crime Laboratory Division Receipt for Exhibits would not be sent to any other department but

would remain part of the Crime Laboratory file and available to detectives or attorneys who requested a copy. *Exhibit 5* at 55: 9-25, 56: 1-9, 57: 3-20, 58: 1-6, 66: 8-25, 67: 1-11.

24.     Defendant Osoba was not responsible for responding to any subpoenas sent to the Chicago Police Department Crime Lab but would bring a copy of any handwritten notes if Defendant Osoba was subpoenaed to testify at court. Defendant Osoba was not served with a subpoena relating to his analysis of the debris from the 2603 W. 24th Place arson. *Exhibit 5* at 68: 9-24, 69: 6-19.

## INVESTIGATION BETWEEN SEPTEMBER 1986 THROUGH FEBRUARY 1987

25.     On September 22, 1986, Doctor Yuksel Konakci of the Cook County Medical Examiner's officer conducted postmortem examinations of Julio Martinez and Gudalupe Martinez. Dr. Konakci determined the cause of death of both Julio and Gudalupe to be carbon monoxide intoxication, due to inhalation of smoke and soot, as a result of a house fire. *Exhibit 1* at CITY-GALVAN 7573, 7664-7673.

26.     On September 22, 1986, Detectives Keane and Baiocchi spoke to 10th District officers, who informed the detectives that Leticia Figueroa – who lived at 2601 W24th Place (the east-side neighbor of 2603 W. 14th Place) – had information relating to the fire. *Exhibit 1* at CITY-GALVAN 7583-7585.

27.     Figueroa told Detectives Keane and Baiocchio that the first floor of 2601 was a tavern called GEMMINI BAR and that the owner (Rito Chacon) was a witness to the arson. *Exhibit 1* at CITY-GALVAN 7583-7585.

28.     Leticia Figueroa told Detectives Keane and Baiocchio that there had been an argument between Jose Santos and Jane Borys that resulted in a window at 2603 W. 24th being broken and Blanca Martinez called the police and evicted both Santos and Borys. Figueroa then allowed Borys

(who had just given birth) to stay at 2601 W. 24th Place until Borys found another place to live. *Exhibit 1* at CITY-GALVAN 7583-7585.

29.     Figueroa told detectives that she had not seen either Borys or Santos since Borys and Santos took all of Borys' belongings from 2601 W. 24th Place, approximately three weeks prior to the fire. *Exhibit 1* at CITY-GALVAN 7583-7585.

30.     Detectives Keane and Baiocchio also spoke to Ed and Alcira Rummery, who lived at 2600 W. Luther. These two individuals informed the detectives that they heard a large bang, observed the flames, and notified the fire department. *Exhibit 1* at CITY-GALVAN 7583-7585.

31.     The detectives also spoke with Juanita Martinez who stated she heard an explosion and observed an individual running across 24th Place and then northbound on Rockwell. *Exhibit 1* at CITY-GALVAN 7583-7585.

32.     Detectives Keane and Baiocchio also spoke with Tobias Trujillo, the brother of Dario. Tobias informed the officers that Dario had said the color of the vehicle he saw driving in the neighborhood was blue. *Exhibit 1* at CITY-GALVAN 7583-7585.

33.     On September 23, 1986, Detectives Vucko and Eveland interviewed Jose Santos, Jane Borys, Mike Ramirez, Juanita Martinez, Rito Chacon, and Blanca Martinez. Detectives Vucko and Eveland documented these interviews in a September 24, 1986 Supplementary Report. *Exhibit 1* at CITY-GALVAN 7568-7572.

34.     Jose Santos ("Santos") informed Detectives Vucko and Eveland that he had been living in the basement apartment of 2603 W. 24th Place with Jane Borys and they had become friendly with a neighbor named Leticia Figueroa, whom their landlord, Blanca Martinez, disliked. *Exhibit 1* at CITY-GALVAN 7568-7572.

11

35.     Santos reported that Blanca Martinez had served Santos and Borys a notice of eviction and a dispute followed when Santos became intoxicated and broke a window in the apartment. Santos was then served with a summon concerning the window and both he and Borys moved out of the basement apartment, with Santos staying with his mother and Borys staying with Leticia Figueroa. *Exhibit 1* at CITY-GALVAN 7568-7572.

36.     Santos was questioned about the fire and informed the officers that Blanca was not well liked by her neighbors and that Jorge Martinez was a Latin King. *Exhibit 1* at CITY-GALVAN 7568-7572.

37.     Santos stated that on September 20, 1986, he left his residence at approximately 10:00 PM and went to the "Casion" tavern at 19th and Oakley and then the "Tino" tavern near 21st Street and Levitt. After approximately an hour, Santos went to the White Horse tavern located at 19th Street and Hoyne. *Exhibit 1* at CITY-GALVAN 7568-7572.

38.     Santos then stated he was driven by an unknown neighborhood acquaintance to a tavern near 18th Street and Paulina, where he remained until approximately 12:30 AM on September 21, 1986. Santos relayed that he went back to the White Horse tavern with Mike Ramirez, where he remained until 1:30 AM, when he walked home to find his mother and Jane Borys awake. Santos stated that the three of them played cards until 3:30 AM, when he went to bed. *Exhibit 1* at CITY-GALVAN 7568-7572.

39.     Santos was given a polygraph examination, which indicated he was not truthful. *Exhibit 1* at CITY-GALVAN 7568-7572, 7559.

40.     Santos then informed the officers that he was not involved in the fire but that a woman named Lisa was mad with Blanca Martinez and said she was going to "fuck up" the Martinez building. *Exhibit 1* at CITY-GALVAN 7568-7572.

12

41.     When questioned, Mike Ramirez denied knowing Jose Santos and denied driving him to any taverns on September 20/21, 1986. *Exhibit 1* at CITY-GALVAN 7568-7572.

42.     When confronted with the Mike Ramirez statement, Santos stated that Mike Ramirez did drive him and it was possible that he was scared to speak to police. *Exhibit 1* at CITY-GALVAN 7568-7572.

43.     Jane Borys told Detectives Vucko and Eveland that Santos left their residence at approximately 10:00 PM on September 20, 1986 and returned at approximately 1:30 AM on September 21, 1986. *Exhibit 1* at CITY-GALVAN 7568-7572.

44.     Jane Borys then stated that the police should be talking to others about the fire as a woman named "Lisa" had threatened to burn the Martinez family home down approximately two weeks prior. *Exhibit 1* at CITY-GALVAN 7568-7572.

45.     Juantia Martinez informed Detectives Vucko and Eveland that she observed the back of an individual running north on Rockwell after she heard screams the night of the fire but did not see the face of the person but believed – based on newspaper reports – that the person was Jorge Martinez. *Exhibit 1* at CITY-GALVAN 7568-7572.

46.     Rito Chacon was interviewed and informed the detectives that he was closing his tavern and cleaning it when he heard three explosions. When he looked out the window, he observed the Martinez building on fire. *Exhibit 1* at CITY-GALVAN 7568-7572.

47.     Chacon also stated that he heard footsteps coming from next door and believed it to be three people but did not see anyone when he ran outside his tavern. *Exhibit 1* at CITY-GALVAN 7568-7572.

48.     Blanca Martinez was re-interviewed and stated that she had prior trouble with Lisa Velez, who was a friend of Leticia Figueroa and Jane Borys. Blanca relayed that Lisa Velez had

threatened to break Blanca's windows and "start killing somebody" and the following day, a window in her home had been broken. *Exhibit 1* at CITY-GALVAN 7568-7572.

49. Blanca then stated that, after the window was broken, Lisa Velez claimed credit and said she was going to kill the "King" in the house, meaning Jorge Martinez. *Exhibit 1* at CITY-GALVAN 7568-7572.

50. On September 24, 1986, Defendant Jin attempted to locate Lisa Velez. Defendant Jin did not locate Lisa Velez but was informed by Velez's mother (Maria Velez) that Lisa Velez had moved to "somewhere on 25th Street." Defendant Jin left Maria Velez a business card and documented the action in a police report. *Exhibit 1* at CITY-GALVAN 7566-7567.

51. On September 24, 1986, Detectives Vucko and Summerville interviewed Laura Cedeo Estrada and re-interviewed Leticia Figueroa. Both witnesses were unable to provide the location of where Lisa Velez lived. *Exhibit 1* at CITY-GALVAN 7564-7565.

52. The witnesses further relayed that Lisa Velez had informed them she had not been involved the arson. However, the witnesses informed the detectives that Lisa Velez had been having difficulty with Jorge Martinez, who told Velez that "my boys killed your brother" and that someone had fired several gunshots are the front of her residence on September 19, 1986. *Exhibit 1* at CITY-GALVAN 7564-7565.

53. On October 1, 1986, Detectives Biancci and Keane interviewed Lisa Velez and her boyfriend Jessie Alva. Lisa Velez informed the detectives that there had been conflict between Blanca Martinez and Jose Santos and Jane Borys. *Exhibit 1* at CITY-GALVAN 7560-7562.

54. Velez also stated the Blanca Martinez had had previous conflict with Leticia Figueroa due to disputes over Leticia's daughter dating Blanca's brother, Guadalupe. Velez informed the

14

detectives that Leticia had told Velez of a threat made by Santos to burn the Martinez family residence. *Exhibit 1* at CITY-GALVAN 7560-7562.

55.     Detectives Biancci and Keane interviewed Jessia Alva on October 1, 1986 and listed his contact information in a police report. *Exhibit 1* at CITY-GALVAN 7560-7562.

56.     On October 8, 1986, Detective Keane interviewed Patricia Gonzales, who was the sister of Leticia Figueroa. Gonzales relayed that Blanca Martinez had threatened to burn her home. *Exhibit 1* at CITY-GALVAN 7557-7558.

57.      Gonzales then relayed – on October 10, 1986 – that she had observed Blanca driving a vehicle in Chicago and provided the license plate number to the detective. *Exhibit 1* at CITY-GALVAN 7557-7558.

58.     On October 10, 1986, Monica Lopez – Blanca Martinez's daughter – contacted Area 4 Violent Crimes and reported that she and Blanca were back in Chicago and provided their contact information. *Exhibit 1* at CITY-GALVAN 7675.

59.     Defendant Centracchio left Area 4 Violent Crimes in approximately October 1986, when he was transferred to the administration section at Area 4. This was not an investigative position. *Exhibit 3* at 17: 7-25.

60.     After being transferred to the administrative section, Defendant Centracchio does not recall any follow-ups with any other detective concerning the 2603 W. 24th Place arson. The only action he took as it relates to the 2603 W. 24th Place Arson investigation after September 21, 1986 was requesting an evidence technician report to Area 4 to photograph a lineup on June 9, 1987. *Exhibit 3* at 59: 24-25, 60: 1-3, 62: 12-25, 63: 1-10.

61.     On December 11, 1986, members of the Martinez family reported that Soccoro Flores saw the offenders and their automobile. This conflicted with Flores' prior statement that she saw

15

individuals in the alley and heard noises from a vehicle, but did not see it. *Exhibit 1* at CITY-GALVAN 7663.

**RE-INTERVIEW OF WITNESSES LIST**

62. On February 19, 1987, Defendants Jones and Switski were assigned to continue the investigation into the 2603 W. 24th Place fire. *Exhibit 1* at CITY-GALVAN 7554-7556.

63. Defendants Jones and Switski re-interviewed Blanca Martinez on February 19, 1987. She informed the detectives that she believed the hostility between her and Figueroa stemming from a belief that Blanca had contacted the Department of Children and Family Services on Figueroa. *Exhibit 1* at CITY-GALVAN 7554-7556.

64. Blanca also relayed to Defendants Jones and Switski that her home window had been broken prior to the fire and she had observed Lisa Velez outside her home immediately prior to the damage. *Exhibit 1* at CITY-GALVAN 7554-7556.

65. Blanca then told Defendants Jones and Switski that Lisa Velez had previously threatened to kill Blanca. Blanca had also been told by her brother Jorge – who was living in Mexico at the time – that Lisa Velez had threatened to burn down the Martinez home prior to the fire occurring. *Exhibit 1* at CITY-GALVAN 7554-7556.

66. On February 20, 1987, Defendants Switski and Jones re-interviewed Jose Santos, Rito Chacon, and Jane Borys. *Exhibit 1* at CITY-GALVAN 7551-7553.

67. Santos relayed to Defendants Switski and Jones a substantially similar account of his prior statement. Santos further told the detectives that he believed Lisa Velez and Leticia Figueroa were responsible for the fire and deaths. *Exhibit 1* at CITY-GALVAN 7551-7553.

68.     Jane Borys informed Defendants Switski and Jones that, one week prior to the fire, Figueroa was upset with Blanca Martinez over a phone call to the police, causing Figueroa and Estrada to be arrested. *Exhibit 1* at CITY-GALVAN 7551-7553.

69.      Lisa Velez then told Figueroa to contact her boyfriend (Jessia Alva), who may be willing to harm the Martinez family as Jorge Martinez was a member of a rival gang. *Exhibit 1* at CITY-GALVAN 7551-7553.

70.     Borys further relayed that, during this conversation, she heard Figueroa and Velez discuss blowing up the Martinez house but then the two decided on setting the house on fire and planned for either a daytime fire or one during a Friday or Saturday night. *Exhibit 1* at CITY-GALVAN 7551-7553.

71.     Jose Santos was contacted a second time on this date and confirmed he was present when Borys, Figueroa, and Velez were talking but Santos denied hearing any of the conversation. *Exhibit 1* at CITY-GALVAN 7551-7553.

72.     Defendants Switski and Jones attempted to locate Lisa Velez but were unsuccessful. *Exhibit 1* at CITY-GALVAN 7551-7553.

73.     On February 22, 1987, Defendants Switski and Jones re-interviewed Figueroa and Estrada. *Exhibit 1* at CITY-GALVAN 7548-7550.

74.     Figueroa confirmed she had prior trouble with Blanca Martinez and that she had been arrested prior to the fire. Figueroa stated that, after she was released from custody, Lisa Velez and six to seven Hispanic men were near the Martinez residence and threatening to burn the house. *Exhibit 1* at CITY-GALVAN 7548-7550.

75.     Figueroa also relayed that she overheard Lisa Velez threaten to burn the Martinez residence because one of the Martinez men was a "Latin King" and that gang was responsible for the murder

17

of Velez's brother. Figueroa denied involvement in the fire but stated she saw Lisa Velez on the street after the fire occurred. *Exhibit 1* at CITY-GALVAN 7548-7550.

76. Laura Estrada spoke to Defendants Switski and Jones and relayed that her sisters – Figueroa and Patricia Gonzales – had told her they overheard Lisa Velez threaten to burn the Martinez residence. *Exhibit 1* at CITY-GALVAN 7548-7550.

77. On March 25, 1987, Defendant Jones drafted a report detailing the attempts to located Lisa Velez and that officers assigned to the Gang Crimes division were being contacted to assist. *Exhibit 1* at CITY-GALVAN 7545-7546.

78. On either April 12, 1987 or April 15, 1987, Lisa Velez was located and spoke with Defendant Switski and Detective Stack. *Exhibit 1* at CITY-GALVAN 7542-7544; *Exhibit 10* at 151: 18-21, 152: 17-25, 153: 1-12, 155: 4-7.

79. Lisa Velez was provided her *Miranda* rights and denied involvement in the arson. Velez told the detectives that on the day before the fire, she was approached by Jorge Martinez, who told Velez that he and his gang (Latin Kings) were responsible for the murder of her brother. *Exhibit 1* at CITY-GALVAN 7542-7544.

80. Velez then stated that four individuals then approached and Martinez recognized them as rival gang members and he left. Velez identified the four individuals as Vinnie Vega, "Lil Isaac," "Johnny," and "Michael." Vega then told Velez that they would avenge her brother's death by getting rid of the Latin King. *Exhibit 1* at CITY-GALVAN 7542-7544; *Exhibit 10* at 158: 18-23.

81. Velez agreed to sit for a polygraph examination but it was unable to be scheduled. *Exhibit 1* at CITY-GALVAN 7542-7544; *Exhibit 10* at 158: 18-23.

82. On May 30, 1987 10th District officers informed Defendants Switski and Jones that "Lil Isaac" was likely Isaac Galvan and "Johnny" was likely Isaac's brother, John Galvan. *Exhibit 1* at 7533; *Exhibit 9* at 88: 20-24, 89: 1-14.

83. On May 30, 1987, Defendants Jones and Switski spoke with Vincent Vega, who had been in custody at the 10th District police station. *Exhibit 1* at CITY-GALVAN 7539-7541; *Exhibit 8* at 52: 17-22, 57: 8-18.

84. Vega informed the detectives that he was with an individual named Roger Gonzalez on September 20, 1986 and that they had visited a local restaurant named Cotullo's after midnight. After eating, Vega and Gonzalez returned to Vega's home, where they sat in Gonzalez's vehicle drinking beer. Vega then noticed fire trucks at 24th and Rockwell but did not go to that location. Vega described his vehicle as a red 1979 Ford Thunderbird 2-door but he no longer had the vehicle. *Exhibit 1* at CITY-GALVAN 7539-7541; *Exhibit 8* at 56: 1-6, 69: 4-25, 70: 1-19; *Exhibit 9* at 79: 17-25, 80: 1, 81: 1-23, 82: 1-18, 83: 4-13, 84: 14-16.

85. On May 30, 1987, Defendants O'Dea and Hanrahan located Roger Gonzalez. Gonzalez stated that he arrived at 24th and Rockwell where he observed Vega, Johnny Galvan, Isaac Galvan, and additional Hispanic males on the street. *Exhibit 1* at CITY-GALVAN 7536-7538.

86. Gonzalez confirmed that he and Vega then went to eat at Cotullo's Restaurant and that they observed fire trucks at 24th and Rockwell when they returned to the neighborhood. *Exhibit 1* at CITY-GALVAN 7536-7538.

87. While she was an active detective in 1987, Defendant O'Dea was approximately 5'8" tall with red hair. *Exhibit 11* at 61: 15-24.

88.     On May 30, 1987, Defendants O'Dea and Hanrahan asked Soccoro Flores to view a line-up containing Vega but Flores was unable to make an identification. *Exhibit 1* at CITY-GALVAN 7534-7535; *Exhibit 11* at 106: 18-25, 107: 1-5.

89.     Flores then informed the detectives that a man named Frank Partida was in the alley at the time of the fire and had told her he saw the offenders. *Exhibit 1* at 7536-7538.

90.     On June 1, 1987, Defendants O'Dea and Hanrahan showed Soccoro Flores a photo array consisting of six photographs, including Isaac Galvan, Plaintiff John Galvan, and Roger Gonzalez. Flores stated that Isaac Galavan resembled the person she saw start the fire at 2603 W. 24th Place but would need to see him in person. *Exhibit 1* at CITY-GALVAN 7532-7533; *Exhibit 14* at CITY-GALVAN 8897-8911

### INTERVIEW OF PARTIDA, RAMIREZ, AND RODRIGUEZ[9]

91.     Defendants Jones and Switski spoke with Partida on June 5, 1987. *Exhibit 1* at CITY-GALVAN 7529-7531; *Exhibit 8* at 223: 18-25, 224: 1-8; *Exhibit 15* at 84: 12-23.

92.     Partida stated that he met with two youths from the neighborhood as he was walking home. During the June 5, 1987 interview, Partida did not provide the youths' names. *Exhibit 1* at CITY-GALVAN 7529-7531; *Exhibit 8* at 229: 4-14; *Exhibit 15* at 88: 13-15

93.     Partida mentioned at least one of the two youths may have been drunk or high. Defendant Switski documented that information in a General Progress Report. *Exhibit 1* at 7648; *Exhibit 8* at 232: 13-22, 234: 5-11; *Exhibit 15* at 89: 2-18;

---

[9] Many of the circumstances surrounding the two interviews of Partida – first by Defendants Jones and Switski and then by Defendants O'Dea and Hanrahan - are disputed. The following statements are only those which are undisputed by all involved.

20

94. Partida relayed that he had observed several individuals in the alley between Luther and 24th Place on September 21, 1986 prior to the fire. *Exhibit 1* at CITY-GALVAN 7529-7531; *Exhibit 8* at 230: 15-21; *Exhibit 15* at 83: 1-8, 86: 1-18.

95. Partida was unable to provide the identity of the individuals whom he saw in the alley on September 21, 1986. *Exhibit 1* at 7529-7531; *Exhibit 8* at 236: 1-7; *Exhibit 15* at 95: 22-25, 96: 1, 97: 11-16, 251: 14-18.

96. Partida also relayed that he observed a light-colored vehicle drive into the alley after the three individuals walked eastbound and that some type of interaction occurred between one of the individuals on foot and someone inside the vehicle, possibly an exchange of some type. Partida stated that the vehicle may belong to an individual named "Tommy." *Exhibit 1* at CITY-GALVAN 7529-31; *Exhibit 8* at 236: 14-23, 237: 16-25, 238: 1-6, 245: 12-25, 246: 1-6; *Exhibit 15* at at 57: 8-25, 237: 3-25, 238: 1-25.

97. After the initial interview with Defendants Jones and Switski, Partida was interviewed a second time by Defendants O'Dea and Hanrahan. During this interview, Partida identified the two youths he was with on September 21, 1986 as "Roach" and "Lil Pepe." *Exhibit 1* at 7526-7528; *Exhibit 11* at 269: 19-25, 270: 1-14; *Exhibit 15* at 107: 10-25, 108: 1-25, 109: 1-18.

98. Defendants O'Dea and Hanrahan identified "Roach" as Rene Rodriguez and "Lil Pepe" as Jose Ramirez. *Exhibit 1* at CITY-GALVAN 7526-7528.

99. Defendants O'Dea and Hanrahan showed Partida a set of eight photographs, which were documented in their June 7, 1987 supplementary report ("June 1987 photographs"). *Exhibit 1* at CITY-GALVAN 7526-7528.

100. Defendants O'Dea, Hanrahan, and Switski interviewed Rene Rodriguez and Jose Ramirez. *Exhibit 1* at CITY GALVAN 7523-7525.

101. Rene Rodriguez informed Defendants O'Dea, Hanrahan, and Switski that he was with "Little Pepe" (Jose Ramirez) and Frank Partida[10] in the early morning hours the date of the fire. Rodriguez informed the officers that he could not remember seeing anyone other than the people he was with prior to the fire. He did remember seeing Johnny Galvan and Isaac Galvan standing with Michael (AKA "Cano") (who had a brother named Arthur (AKA "Pumpkin")) on the street watching the fire approximately 30 minutes after the fire began. *Exhibit 1* at CITY GALVAN 7523-7524.

102. Jose Ramirez informed Defendants O'Dea, Hanrahan, and Switski that he was with Frank Partida and Rene Rodriguez ("Roach") near Washtenaw and 24th Place when Rodriguez saw several Hispanic males cut through a gangway on 24th Place and enter the alley between 24th Place and Luther Street. *Exhibit 1* at CITY GALVAN 7523-7524.

103. Ramirez then informed the detectives that Ramirez and Rodriguez went to the mouth of the alley and Rodriguez stated that it was "Michael" and the D's (disciples). Ramirez relayed that he saw four individuals in the alley and recognized two of the people. Ramirez told the detectives that he recognized "Michael," who had a nickname of "Cano" and was brothers with "Arthur," who had a nickname of "Pumpkin." *Exhibit 1* at CITY GALVAN 7523-7524.

104. Ramirez then told the detectives that an individual next to Michael turned towards them and Ramirez recognized the person as "Johnny Galvan." *Exhibit 1* at CITY GALVAN 7523-7524.

105. Ramirez stated that he had known "Michael" for about two years and had known Johnny Galvan and his brother "for most of his life." *Exhibit 1* at CITY GALVAN 7523-7524.

---

[10] The police reports contain several different spellings of Frank Partida. For clarity, City Defendants use the accurate spelling in this statement of fact.

106.    The four individuals then continued walking eastbound down the alley. At that point, Ramirez and Rodriguez stopped watching the four individuals and travelled north to 24th Place. *Exhibit 1* at CITY GALVAN 7523-7524.

107.    Ramirez then informed the detectives that he, Partida, and Rodriguez were walking east on 24th Place when they heard a woman screaming for help and they ran to see a building on fire. Ramirez relayed that he heard the woman screaming approximately 15-20 seconds after Ramirez had observed the four individuals walking eastbound in the alley. *Exhibit 1* at CITY GALVAN 7523-7524.

108.    Ramirez informed the detectives that, shortly after the fire started, he saw Isaac Galvan standing on the corner of 24th Place and Rockwell wearing a white v-neck t-shirt. Ramirez also relayed that Michael had been wearing a dark top with a hood. *Exhibit 1* at CITY GALVAN 7523-7524.

109.    Ramirez was shown the eight June 1987 Photographs. From those, Ramirez identified Plaintiff Galvan as one of the two individuals he observed walking down the alley. *Exhibit 1* at CITY GALVAN 7524-7525

110.    Ramirez was also shown a black-and-white photograph of Michael Almendarez. Ramirez identified Michael Almendarez as the "Michael" he observed walking down the alley with Plaintiff Galvan. *Exhibit 1* at CITY GALVAN 7524-7525.

111.    From those eight photographs, Ramirez identified the photographs of Michael Almendarez and John Galvan as the two individuals he recognized in the alley. *Exhibit 1* at CITY GALVAN 7524-7525.

## JUNE 8, 1987 INTERVIEWS OF MICHAEL ALMENDAREZ AND PLAINTIFFS GALVAN, ALMENDAREZ, AND NAÑEZ[11]

112.     At approximately 9:10-10:00 AM on June 8, 1987, Michael Almendarez was located by police officers and transported to Area 4. *Exhibit 1* at CITY-GALVAN 7512-7518; *Exhibit 28* at GALVAN 471, 474-475, 544: 14-24, 545: 1-24, 546: 13-19.[12]

113.     Defendant Victor Switski and Defendant Hanrahan were the two officers who interviewed Michael Almendarez, starting at approximately 10:30 AM.[13] *Exhibit 10* at 203: 7-11; *Exhibit 28* at 476.

114.     At approximately noon on June 8, 1987, Plaintiff Galvan was located by Chicago Police Department officers and transported to Area 4. *Exhibit 28* at 477, 549: 12-24, 550: 1-8.

115.     At approximately 12:30 PM, Plaintiff Galvan was interviewed by Defendants Switski and Hanrahan. *Exhibit 28* at 477, 549: 12-24, 450: 1-8.

116.     At approximately 3:00 PM on June 8, 1987, Plaintiff Almendarez was located and transported to Area 4. *Exhibit 28* at 478-479, 551: 4-17.

117.     Plaintiff Almendarez was questioned by Defendants Switski and Hanrahan. *Exhibit 28* at 478-479, 551: 4-17.

---

[11] As set forth in subsequent footnotes, the circumstances surrounding the interviews of Michael Almendarez, John Galvan, Arthur Almendarez, and Francisco Nañez are disputed by Plaintiffs and Individual City Defendants. The footnotes are to provide the Court context as to why no undisputed factual allegations relating to the interviews themselves are included in Individual City Defendants' Local Rule 56.1 statement and as to why Individual City Defendants are submitting only a motion for partial summary judgment.

[12] The trial transcripts are of poor quality and many of the line numbers are obscured. In those situations, Individual City Defendants provide the Court with the page citation. To the extent possible, Individual City Defendants provide both the page and line citations.

[13] The circumstances of Michael Almendarez's interview by Defendants Switski and Hanrahan are disputed. Michael Almendarez claims the two officers physically abused him while Defendants Switski and Hanrahan have denied such accusations.

24

118.    Plaintiff Almendarez claims that, at some point, an unknown female entered the room with equipment that appeared similar to that used by court reporters. Plaintiff Almendarez did not believe her to be a police officer. *Exhibit 30* at 136: 3-11, 137: 6-17.

119.    Plaintiff Almendarez claims this unknown female told him to just tell the police officers what they wanted to know and then called him a "lying spick fucking bastard who's going to fry". *Exhibit 30* at 138: 11-24.

120.    Plaintiff Nañez was located by law enforcement officers and transported to Area 4, where Defendants Hanrahan and Switski interviewed him at approximately 5:30 PM. *Exhibit 28* at 482-483, 553: 19-24, 554: 1-4.

121.    Michael testified that, at some point, a 6' tall, blond female officer entered the room and Michael told her he had been abused by the other officers. This unknown female responded "Oh, really" and left. *Exhibit 39* at 171: 21-25, 172: 1-24, 173: 1-4.

122.    Michael claims that approximately one minute after the unknown female officer exited, the two detectives re-entered the room, along with a state's attorney. *Exhibit 39* at 173: 5-15.

123.    Detectives contacted the Felony Review unit of the Cook County State's Attorney's Office and ASA Joel Leighton responded to Area 4. *Exhibit 10* at 224: 2-23; *Exhibit 44* at 30: 13-21.

124.    ASA Leighton spoke with Defendant Switski gave a synopsis of the arson investigation. ASA Leighton only recalls speaking with Defendant Switski and not any other detective. *Leighton dep* at: 43: 8-21, 54: 14-21.

125.    On June 8, 1987, Plaintiff Almendarez spoke with ASA Leighton. *Exhibit 44* at 135: 1-17. Plaintiff Almendarez claims he told ASA Leighton that the officers had been beating him and were trying to force him to confess. At that time, Plaintiff claims ASA Leighton left the room and

25

Defendant Hanrahan physically assaulted him. *Exhibit 30* at 182: 14-20, 183: 5-8, 184: 12-24, 185: 1-11.

126.    Plaintiff Almendarez then stated ASA Leighton returned and Almendarez told the prosecutor a second time that Defendant Hanrahan had physically assaulted him. At that, ASA Leighton left the room a second time. *Exhibit 30* at 187: 12-24, 188: 1-20.

127.    According to Plaintiff Almendarez, ASA Leighton would ask a question and Defendant Hanrahan would respond "yeah, whatever he says." *Exhibit 30* at 190: 8-24, 191: 1-15, 193: 1-5.

128.    ASA Leighton then drafted a handwritten statement. Plaintiff Almendarez then signed the handwritten statement, along with ASA Leighton and Defendant Hanrahan. *Exhibit 30* at 194: 16-19196: 1-16; *Exhibit 40; Exhibit 44* at 134: 11-25, 135: 1-3, 140: 16-25.

129.    The handwritten statement signed by Plaintiff Almendarez reads:

> After being advised that Mr. Leighton was an assistant state's attorney, a lawyer working with the police and not his lawyer, and stating that he understood this fact and after being advised of his constitutional rights one at a time and stating that he understood each one, Arthur Almendarez agreed to give the following statement which is a summary and not word for word. Arthur Almendarez stated that he was with John Galvan and Francisco Nanez in the early morning hours of September 21, 1986 at 2630 W. 24th Street. At that location John Galvan told Nanez and Almandarez that he wanted to go over and burn a house over on 24th Place because some guys that live there had shot at him a couple of weeks before. John Galvan then asked Almendarez and Nanez to go with him to get some gasoline. Arthur Almendarez and Francisco Nanez then went with John Galvan to a gas station at 23rd and Western. John Galvan then held an empty milk container while Arthur Almendarez pumped the gasoline into it. Almendarez stated that he, John Galvan and Francisco Nanez drove back to 2630 W. 24th Street. Almendarez states that he, Nanez and Galvan then walked over to the alley next to 2603 W. 24th Place. Almendarez states that he, Nanez and Galvan walked down the alley. Almendarez then stopped by a garage about 20 feet from 2603 W. 24th Place. Nanez and Galvan walked around the garrage [sic] at 2603 W. 24th Place. Almendarez stated that several minutes later Nanez and Galvan ran by and told him to run. Almandarez then ran to his mothers house at 2626 W. 24th Street. Arthur Almendarez stated that the police and the state's attorney had treated him well. Arthur Almendarez also stated that no one threatened him or promised him anything to get him to make this statement. Arthur Almendarez was given water, coffee and cigarettes by the police and the assistant states attorney. Assistant states attorney Leighton read this

26

statement to Arthur Almendarez before Arthur Almendarez signed it. Arthur Almendarez can read English and was allowed to read this statement before signing it. Arthur Almendarez is free of the effects of drugs or alcohol.

*Exhibit 40.*

130.    Plaintiff Galvan alleges he was abused by Defendant Switski when the two of them were alone and forced to memorize a statement implicating him in the 2603 W. 24th Place arson. *Exhibit 31* at 177: 5-12, 179: 14-19, 180: 22-24, 182: 2-21, 183: 2-24, 184: 1-19, 185: 6-8.

131.    According to Plaintiff Galvan, Defendant Switski took Galvan to a room where ASA Leighton was sitting at a table. *Exhibit 31* at 190: 14-24.

132.    According to Plaintiff Galvan, ASA Leighton asked Galvan about the statement he provided and Galvan nodded "no" when asked if the statement was true. *Exhibit 31* at 191: 6-24, 192: 1-6.

133.    Plaintiff Galvan then stated ASA Leighton left the room and Defendant Switski pushed his head to the table and threatened him. ASA Leighton then re-entered the room and Galvan agreed to everything the prosecutor said. *Exhibit 31* at 192: 14-17, 193: 1-23.

134.    At 10:25 PM on June 8, 1987, Plaintiff Galvan gave a court reported statement wherein he was asked questions by ASA Leighton and Plaintiff Galvan answered. Defendant Switski was present during this statement. *Exhibit 42*; *Exhibit 44* at 180: 4-18.

135.    The June 8, 1987 court reported statement of John Galvan reads:

Examination

Q I talked to you earlier and explained that I am an Assistant State's Attorney, a lawyer working with the police, and not your lawyer, is that correct?

A Yes.
Q And before we spoke, I advised you of your Constitutional Rights, is that correct?
A Yes.
Q I am going to read you your rights again. Do you understand you have a right to remain silent?
A Yes.

Q Do you understand that anything you say can be used against you in a Court of Law?

A Yes.

Q Do you understand you have a right to talk to a lawyer and have him present with you while you are being questioned?

A Yes.

Q And do you understand if you cannot afford to hire a lawyer, one will be appointed by the court to represent you if you wish one?

A Yes.

Q Understanding these rights, do you wish to talk to us now?

A. Yes.

Q. John,* I want you to think back to September 21, 1986 in the early morning. First of all, were you a member of any gang at that time?

A Yes.

Q What gang is that?

A Satan Disciples.

Q Do you know of another gang named Villa Lobos?

A Yes.

Q -What is the relationship of the Villa Lobos and the Satan Disciples?

A They don't get along.

Q Would it be fair to say that they are enemy gangs?

A Yes.

Q. Now prior to September 21, 1986, had you had any problems with certain members of the Villa Lobos Gang?

A Yes, about two weeks before that happened, the fire --

Q What happened?

A They started shooting at me.

Q This was about two weeks before September 21, 1986?

A Yes.

Q Now, going back to September 21, 1986, at about 4:00 o'clock in the morning, 4:30, were you with anyone?

A My girlfriend.

Q Were you with anyone else after that?

A Cisco and Arthur.

Q Did you Cisco and Arthur have a conversation?

A. Yes, we did.

Q What did you decide to do?

A To go scare them.

Q How were you going to scare them?

A To throw like a gas bomb.

Q To scare whom?

A The Villa Lobos.

Q Where did the two Villa Lobos live?

A On 24th Place by Rockwell.

Q After you decided to do this, what happened next?

A They went to go get the gas.

28

Q Who went to get the gas?
A Cisco and Arthur.
Q Where did they go?
A. Martin* Gas Station.
Q Did they come back?
A Yes.
Q When they came back, did they have anything with them?
A The gas.
Q After they came back with the gas, did you go with them after that?
A Yes.
Q Where did you go?
A To the house.
Q Is that the house at 2603 West 24th Place?
A Yes.
Q Now before you got to the house, what kind of container was the gasoline in?
A An empty Miller bottle.
Q Did you put it in any other container?
A No.
Q Did anybody put anything in the top of the bottle?
A A cloth.
Q After you got to 2403 West 24th Place, who was over there?
A Cisco, Arthur, and me.
Q What happened, who did what?
A Well, Cisco threw a bottle at the house.
Q Did he do anything with the cloth in the bottle?
A Stuffed it inside the bottle, lit it up, and threw it at the wall and it started a fire.
Q Was there gasoline on the wall?
A Yes.
Q What happened next?
A Then I threw a cigarette to the side of the wall.
Q And what happened with the gasoline?
A It just made a little fire.
Q After that happened, where did you go?
A Back to 24th Street.
Q Did you leave 2603 West 24th Place with anybody?
A With Cisco and Arthur
Q You have been here in the police station, how have the police treated you?
A Okay.
Q How have I treated you?
A Okay.
Q Did you get any cigarettes?
A Yes.
Q Who gave you the cigarettes?
A You and the officer.
Q Did you get anything to drink?
A Yes.

29

Q What did you get?
A Coffee.
Q And has anyone threatened you or promised you anything in exchange for this statement?
A No.
MR. LEIGHTON: Let the record reflect that the time is now approximately 10:30 p.m. and this concludes the statement of John Galvan.*

*Exhibit 42* *denotes spelling corrections in statement itself.

136.    Plaintiff Galvan then initialed each page of the six-page transcript of his statement and signed the last page. ASA Leighton and Defendant Switski also initialed or signed each page. *Exhibit 31* at 199: 4-21, 200: 18-21, 201: 1-2; *Exhibit 42*.

137.    At 11:05 PM on June 8, 1987, Plaintiff Nañez gave a court reported statement wherein he was asked questions by ASA Leighton and Plaintiff Nañez answered. *Exhibit 43*.

138.     Plaintiff Nañez then initialed each page of the six-page transcript of his statement and signed the last page. ASA Leighton and Defendant Switski also initialed or signed each page. *Exhibit 32* at 121: 6-7; *Exhibit 43*.

139.    The June 8, 1987 court reported statement of Plaintiff Nañez reads:

Examination

    Q Now, Francisco, I talked to you earlier and explained that I am an Assistant State's Attorney, a lawyer with the police and not your lawyer; is that correct?
    A Yes.
    Q Before we spoke, I advised you of your Constitutional Rights; is that correct?
    A Yes.
    Q I am going to read you your rights again. Do you understand you have a right to remain silent?
    A Yes.
    Q Do you understand that anything you say can be used against you in a Court of Law/
    A Yes.
    Q Do you understand you have a right to talk to a lawyer and have him present with you while you are being questioned?
    A Yes.
    Q Do you understand if you cannot afford to hire a lawyer, one will be appointed by the court to represent you before any questioning if you wish one?

30

A Yes.

Q Understanding these rights, do you wish to talk to us now?

A Yes.

Q Now Francisco, I want you to go back to September 21, 1986, at around 4:00, 4:30 in the morning. Where were you?

A I was on the street, on 24th, between Washtenaw and Rockwell.

Q Who were you with?

A My friend Arthur and my other friend John.

Q Did you have a conversation with those two guys?

A Yes.

Q What did you guys talk about?

A My friend John was talking about, he wanted to burn somebody's house down.

Q Did he tell you why he wanted to go do that?

A He had some kind of difficulty, problems with this person.

Q What did you decide to do?

A First, I didn't want nothing to do with it. Buy my friends convinced me to go along with it.

Q After your friends convinced you to go along with it, what were you going to do?

A I got into the car, Arthur's car. We took the drive to the gas station.

Q Where is the gas station?

A At 24th and Western, called Martins. He filled it up, he had a milk container.

Q Was the container full or empty?

A Quarter way full, not that much.

Q What happened after you got to the gas station?

A At that time I was sitting in the car, and Arthur went to pay for the gas, and John was pouring the gas in the container.

Q After the gas was in the container, did you do anything?

A Yes.

Q Who did you go with?

A Me, Arthur, and John took a radio, parked the car about a block south of Ceremak, rode on Washtenaw Street.

Q Where did you go then?

A We all got out of the car, starting walking down Washtenaw towards the alley, and one of the guys suggested we need a bottle.

Q Do you remember which guy that was?

A John.

 And did anybody find a bottle?

A Yes, but I can't remember. But I am pretty sure it could have been Arthur.

Q What kind of bottle was it?

A Hard Liquor bottle.

Q What happened after they found the bottle?

A John and Arthur were talking, and they said – John was pouring the gasoline into the bottle that Artur was holding.

Q After they poured the gasoline into the bottle, where did the three of you go?

A Started walking down the same alley toward this one building?

Q Is that the building at 2603 West 24th Place?

31

A Yes, I believe so.

Q When you got to the building, what happened?

A John went up to the house, after the bottle was filled with gasoline.

But he still had the other container filled with gas in there, went up to the building, poured gasoline over the back of the house. Then we found a piece of clothing from a cocktail bomb.

Q Okay.

A Arthur or John put the cloth in the bottle. He asked me for a light, and I told him I didn't have one.

I can't recall if Arthur gave him a light or not; or if Johnn had a light.

Q What happened then?

A Then they lit the bottle.

Q Who lit the bottle?

A Johnny did, lit the bottle, threw it through the window. And the bottle shattered; and from the flame from the bottle, hit the back of the house and the house went up in flames.

Q What did you do next?

A After that, we cut through the back, the same way we came from, from Washtenaw, across the street from Washtenaw in the alley, went through a gangway around the block on 24th Street.

Q Now when you went to the gas station to get gas, who drove?

A Arthur did.

Q Now while you have been here in the police station, have you been treated okay by the police?

A Yes, I have.

Q And have I treated you okay?

A Yes, you have.

Q Were you given anything to eat?

A Yes.

Q What did you have?

A I had a Polish with fries and a large coke.

Q Hav you had any coffee while you have been here?

A Three cups of coffee.

Q Did I give you cigarettes or did you have your own?

A I had my own.

Q Now during the time you have been here, has anyone threatened you to make this statement or promised you anything in exchange for this statement?

A No.

Mr. Leighton: Let the record reflect that the time is now approximately 8 minutes after 11:00 o'clock at night, and this concludes the statement of Francisco Nanez.

*Exhibit 43* *denotes spelling corrections in statement itself*

32

140.   After each Plaintiff gave their statement, a polaroid photograph was taken of them. *Exhibit 30* at 208: 1-24, 209: 1; *Exhibit 31* at 220: 9-24, 221: 1-10; *Exhibit 32* at 130: 2-23; *Exhibit 29* at 596: 9-24; *Exhibit 44* at 286: 15-25, 287: 1-25; *Exhibit 45*.

141.   Michael Almendarez signed a handwritten statement at approximately 1:00 AM on June 9, 1987. ASA Leighton and Defendant Jones also signed the handwritten statement. *Exhibit 39* at 180: 17-22; *Exhibit 41*.

142.   Defendant Jones had no involvement in questioning Michael Almendarez prior to being physically present when Michael was in the room with ASA Leighton. *Exhibit 8* at 88: 3-11.

143.   The statement Michael signed reads as follows:

> After being advised that Mr. Leighton was an assistant state's attorney, a lawyer who worked with the police and not his lawyer, Michael Almendarez agreed to give the following statement which is a summary and not word for word.
>
> Michael Almendarez stated that Arthur Almendarez is his brother. Michael Almendarez also has known John Galvan and Francisco Nanez for several years. Michael Almendarez stated that he had a conversation sometime in the first week in October of 1986 with John Galvan and Francisco Nanez. John Galvan and Francisco Nanez to Michael Almandarez that they had started a fire back in September of 1986 on 24th Place. Nanez and Galvan told Michael Almandarez that Nanez had thrown a bottle of gasoline against the side of the house and Galvan had lit the gasoline with a match. Michael Almandarez stated that the police and assistant state's attorney had treated him. Almandarez also stated that no one threatened him or promised him anything in exchange for this statement. Almandarez knows how to read English and was allowed to read this statement before signing it. Michael Almandarez is free of the effects of drugs or alcohol.[14]

*Exhibit 41*.

144.   At 7:15 PM on June 8, 1987, Soccoro Flores viewed a lineup consisting of Plaintiffs Galvan, Nañez, and Almendarez, as well as Michael Almendarez and Issac Galvan. Soccoro Flores was unable to identify anyone in the line-up. Detectives O'Dea, Hanrahan, Switski, and Jones are documented as conducting the June 8 Flores lineup. *Exhibit 1* at CITY-GALVAN 7521-7522.

---

[14] Spelling and grammatical errors are found in the original.

145. At 10:30 PM on June 8, 1987, Jose Ramirez viewed a lineup consisting of Plaintiffs Galvan, Nañez, and Almendarez, as well as Michael Almendarez and Issac Galvan. Ramirez identified Plaintiff Galvan and Michael Almendarez as two of the individuals he observed walking down the alley prior to the fire. Detectives O'Dea, Hanrahan, Switski, and Jones are documented as conducting the June 8 Ramirez lineup. *Exhibit 1* at CITY-GALVAN 7519-7520.

146. Defendants Switski, Jones, O'Dea, and Hanrahan are identified as the Reporting Detectives on the June 9, 1987 "Clear/Closed by arrest" report. *Exhibit 1* at CITY-GALVAN 7512-7518.

147. Defendant Jones was not present when Plaintiffs Galvan, Almendarez, or Nañez were questioned. *Exhibit 8* at 91: 24-25, 92: 1-7.

148. ASA Leighton approved felony charges against the three Plaintiffs. *Exhibit 1* at CITY-GALVAN 7596.

149. Defendant Switski signed criminal complaints against Plaintiff Almendarez for the murder of Julio and Guadalupe Martinez. Defendant Hanrahan signed a criminal complaint against Plaintiff Almendarez for aggravated arson. *Exhibit 56* (*Signed criminal complaints – Almendarez*).

150. Defendant Hanrahan signed three criminal complaints against Plaintiff Galvan: one for the murder of Julio Martinez, one for the murder of Guadalupe Martinez, and one for aggravated arson. *Exhibit 56* (*Signed criminal complaints – Galvan*).

151. Defendant Hanrahan signed three criminal complaints against Plaintiff Nañez: one for the murder of Julio Martinez, one for the murder of Guadalupe Martinez, and one for aggravated arson. *Exhibit 58* (*Signed criminal complaints – Nañez*).

152. Defendant Almanza had no involvement in the 2603 W. 24th Place arson investigation in any capacity. *Exhibit 16* at 147: 19-25, 148: 1-25, 149: 1-20, 150: 10-17, 154: 1-14.

## CRIMINAL PROCEEDINGS

153.    On June 24, 1987, Defendant Jones testified in front of the grand jury and testified as to information that was personally known to him and information that was relayed to him through police reports and conversations with other detectives. Defendant Jones testified that Plaintiffs had each made a statement implicating themselves in the fire. The Grand Jury issued indictments against all three Plaintiffs. *Exhibit 9* at 147: 5-12; *Exhibit 46* at PRIV624: 6-12; *Exhibit 59* (*Criminal Indictments*).

154.    Frank Partida testified in his deposition that, at some point between when he spoke to police officers in June 1987 and prior to the Plaintiffs' convictions, he spoke with an assistant state's attorney with the Cook County State's Attorney's Office. During that meeting Partida informed the prosecutor that he believed Ramirez and Rodriguez were intoxicated on September 21, 1986. Partida also informed the prosecutor that he did not recognize the three people he saw in the alley. *Exhibit 15* at 251: 19-25, 252: 1-6, 253: 2-9, 254: 2-8.

155.    In October 1988, an investigator Jack King working for Plaintiff Galvan's criminal defense attorney Jack Smeeton interviewed Partida, Ramirez, and Rodriguez. King then drafted a report. *Exhibit 17*; *Exhibit 47* at 24: 5-23.

156.    Jack King documented that he had a home visits and phone calls with Rene Rodriguez, a home visit with Frank Partida, and multiple job visits with Jose Ramirez. *Exhibit 17* at CCPD Subpoena Resp 2254-2255.

157.    King's summary of the Rodriguez interview read as follows:

> On October 11, 1988, a home interview was conducted with Rene Rodriguez at 2630 W. Luther, phone number 254-1419. Mr. Rodriguez stated that he was present at four or five in the morning the day of the fire, drinking beer and becoming intoxicate. In Mr. Rodriguez's opinion, both he and a friend, Jose Ramirez, were "fucked up". Mr. Rodriguez further related that he did see a few individuals running in an alley immediately prior to the fire but was unable to identify any of them. Mr.

Rodriguez related that he is familiar with the Galvin brothers from the neighborhood and did not see them before or after the fire.

*Exhibit 17* at CCPD Subpoena Resp 2254.

158. King's summary of the Partida interview read as follows:

On October 11, 1988, a home visit was conducted with Frank Partida at 5028 S. Rockwell, phone number unknown. Mr. Partida stated that he was walking to a bus stop at approximately four in the morning after completing work as a bouncer at Chunkey's located at approximately 2600 W. 26th St. Mr. Partida related that while walking to the bus stop he encountered neighborhood acquantances [sic] Rene Rodriguez and Jose Ramirez who were in his opinion, extremely drunk. Mr. Partida reported that while attempting to walk Rene Rodriguez and Jose Ramirez home due to their inebriation, he observed a backside view of three male individuals walking eastbound in an alley, two of whom were wearing sleeveless white T-shirts. Mr. Partida added that he would definitely not be able to identify any of the individuals in the alley noting that he only observed these individuals for a second out of the corner of his eye.

This investigator presented Mr. Partida with statements and identifications he allegedly made to the police. Mr. Partida insisted that he was unable to identify the three male youths that he viewed for a second or two shortly before the fire and feels that Rene Rodriguez and Jose Ramirez would also be unable to identify due to their poor view of the alley and drunken state. Mr. Partida further related that the photo identification of Isaac Galvan shown to him by the police and their efforts to have him positively identify Mr. Galvan as one of the individuals in the alley on the morning of the fire. Mr. Partida explained to the police that he recognized Mr. Galvan in the photo shown to him only from past experience with him as a baseball coach. Mr. Partida further related that he did not see Mr. Galvan or the individuals seen earlier that evening in the alley after the fire started and neighborhood people started to gather. He did indicate that there were many gang members present watching the efforts of the Chicago Fire Department.

*Exhibit 17* at CCPD Subpoena Resp 2254-2255.

159. King's summary of the Ramirez interview read as follows:

On October 16, 1988, subsequent to the five attempted personal interviews, an employment visit was conducted at Jewel Food Stores, 2700 W. 26th St. Mr. Ramirez's home address is 2611 W. 23rd St., phone number 247-5102.

Mr. Ramirez stated that he was very intoxicated at the time of the fire and does not remember seeing anyone prior to the fire expect the two other witnesses Frank Partida and Rene Rodriguez. Mr. Ramirez further related that he does know Mr. Galvan and did not see him at all on the day of the fire.

*Exhibit 17* at CCPD Subpoena Resp 2255.

160.    On April 19, 1988, Plaintiff Galvan's criminal defense attorney Jack Smeeton filed a motion to quash arrest and suppress evidence. *Exhibit 48* at CCPD Subpoena Resp 10186-10188.

161.    The trial court heard evidence on Plaintiff Galvan's April 19, 1988 motion on June 13, 1988 and June 14, 1988. *See, generally Exhibit 19; Exhibit 49*

162.    Plaintiff Galvan testified on June 13, 1988. *Exhibit 19* at 2: 4-24, 3: 1-24, 4: 1-16.

163.    Defendant Hanrahan testified on June 13, 1988 and was subject to cross-examination by Plaintiff Galvan's attorney. *Exhibit 19* at 5-61.

164.    Defendants Hanrahan and Switski both testified that on June 8, 1987, Michael Almendarez informed him and Defendant Switski that Michel had a conversation in October 1986 with John Galvan and Francisco Nañez in which they told Michael they were responsible for starting the fire at Rockwell and 24th Place, that Nañez had a bottle filled with gasoline and threw it against a wall, and that Galvan had lighted the gasoline with either a match or cigarette. *Exhibit 19* at 13: 8-22, 102: 17-24, 103: 1-10.

165.    Defendant Hanrahan testified that Frank Partida did not identify John Galvan as any of the individuals who was in the alley prior to the September 21, 1986 fire. *Exhibit 19* at 40: 23-24, 41: 1.

166.    Michael Almendarez testified on June 13, 1988 after being called to the stand by Plaintiff Galvan's attorney. *Exhibit 19* at 63-100.

167.    Michael Almendarez testified that neither Francisco Nañez nor Johnny Galvan told him that they had started a fire during a conversation in October 1986 and that Michael had lied to police when he told them that. *Exhibit 19* at 73: 23-24, 74: 1-12.

168.     Michael testified that there was "no" reason why he did not tell the truth to the police. *Exhibit 19* at 75: 1-8.

169.     Michael testified that the detectives "put words in [his] mouth" when he spoke to ASA Leighton. Michael also testified that the detectives questioning him had told Michael statements from a notebook that Michael then repeated to ASA Leighton. *Exhibit 19* at 87: 9-22, 95: 23-24, 96: 1-19.

170.     Defendant Switski testified on June 13, 1988 and was subject to cross-examination by Plaintiff Galvan's attorney. *Exhibit 19* at 100-124.

171.     Defendant Switski was shown a copy of Plaintiff Galvan's court reported statement and Plaintiff Nañez's statement during his cross-examination by Plaintiff Galvan's attorney and answered questions concerning the substance of both statements. *Exhibit 19* at 113: 11-24, 114: 13-21, 117: 23-24, 118: 1-20.

172.     On June 14, 1988, ASA Leighton testified and was subject to cross-examination by Plaintiff Galvan's attorney. *Exhibit 49* at 2-38.

173.     ASA Leighton testified as to the statement he took from Michael Almendarez in June 1988, that he reduced that statement to writing, and that Michael Almendarez signed the handwritten statement. A copy of Michael's statement was used during ASA Leighton's testimony. *Exhibit 49* at 5: 12-24, 6: 1, 10: 1-22, 12: 4-16, 13: 17-24.

174.     Upon cross-examination by Plaintiff Galvan's attorney, ASA Leighton authenticated Plaintiff Galvan's June 8, 1987 court reported statement. *Exhibit 49* at 19: 3-23.

175.     Upon cross-examination by Plaintiff Galvan's attorney, ASA Leighton authenticated Plaintiff Nañez's June 8, 1987 court reported statement. *Exhibit 49* at 21: 15-20.

176. Defendant Switski was called again on June 14, 1988 and was subject to cross-examination by Plaintiff Galvan's attorney. *Exhibit 49* at 40-46.

177. The trial court denied Plaintiff Galvan's April 19, 1988 motion on June 17, 1988. *Exhibit 33* at GALVAN 4825.

178. Plaintiff Almendarez's attorney Gary Brownfield filed a motion to quash arrest and motion to suppress on September 14, 1988. *Exhibit 35* at GALVAN 4646; *Exhibit 50*.

179. On September 14, 1988, the trial judge (Honorable Shelvin Singer) conducted a hearing on Plaintiff Almendarez's September 1988 motion. *Exhibit 20*.

180. Defendant Switski was called as a witness on September 14, 1988 and testified that Plaintiff Galvan gave a statement in which he stated he, Francisco Nañez, and Arthur Almendarez had been involved in the September 21, 1986 arson of 2603 W. 24th Place. *Exhibit 20* at IND DEF 22142 6-17, 22143: 1-24, 22144: 1-17, 22161: 9-20.

181. Plaintiff Almendarez's attorney made an offer of proof to the trial court as to the substance of Michael Almendarez's June 1987 statement. *Exhibit 20* at IND DEF 22154: 9-24

182. Defendant Switski, upon questioning by Plaintiff Almendarez's attorney, testified as to the substance of Michael Almendarez's June 1987 statement and confirmed that Michael Almendarez did not indicate that Plaintiff Almendarez was present at the time of the arson. *Exhibit 20* at IND DEF 22155: 22-24, 51: 1-14.

183. Defendants Hanrahan and Switski testified on September 14, 1988 in the motion to suppress phase of the hearing. *Exhibit 20* at IND DEF 22187: 15-18, 22225: 6-9.

184. The trial court denied Plaintiff Almendarez's motion to suppress. *Exhibit 20* at IND DEF 22240: 20-21.

185. Plaintiff Nañez's attorney filed a motion to quash arrest and suppress evidence. *Exhibit 51*.

186. On October 12, 1988, the trial court (Honorable Shelvin Singer) conducted a hearing premised on Plaintiff Nañez's motion to quash. *Exhibit 21*.

187. During the October 12, 1988 hearing, Defendant Switski testified as to the substance of Plaintiff Galvan's statement. *Exhibit 21* at EP GALVAN 57168: 18 – 57170: 16.

188. During the October 12, 1988 hearing, Defendant Switski testified as to portions of the statement by Plaintiff Almendarez. *Exhibit 21* at EP GALVAN 57193: 11-24, 57194: 1-3, 57198: 21-24, 57199: 1.

189. The trial court denied Plaintiff Nañez's motion to suppress on October 21, 1988. *Exhibit 34* at GALVAN 4995.

190. Defendant Centracchio had no involvement in the criminal prosecution of Plaintiffs Galvan, Nañez, or Almendarez. *Exhibit 3* at 64: 7-12.

191. Plaintiff Galvan's attorney knew that he could go to view physical evidence collected by the police. *Exhibit 61* (*January 21, 2025 Deposition of Jack Smeeton*) at 5: 12-15.

192. Plaintiff Nañez's attorney knew that he could go to view physical evidence collected by the police. *Exhibit 62* (*January 28, 2025 Deposition of Kenneth Fletcher*) at 8: 6-24, 9: 1-8.

### Galvan's criminal trial – May 1989

193. Plaintiff Galvan's criminal trial began on May 24, 1989. The State called Jorge and Blanca Martinez, Soccoro Flores, Jose Ramirez, Raudel Casanova, Defendant Scheithauer, Defendant Switski, and ASA Leighton. *Exhibits 22, 23, 24, 25, 26*.

194. Jorge Martinez testified and was asked by Plaintiff Galvan's attorney about threats made by a woman to burn his house down. *Exhibit 23* at 1338.

195. Blanca Martinez testified and was asked questions about Jose Santos and Lisa Velez by Plaintiff's attorney. *Exhibit 23* at 1351, 1352.

196.    Soccoro Flores testified that she observed at least two individuals in the alley and one had a handkerchief or towel and threw into the second floor window of 2603 W. 24th Place and a fire started. One of the individuals had short hair that was "nice and combed." *Exhibit 23* at 1367-66.

197.    Flores testified that she did not identify any one in the lineups she viewed as the person she saw throw the bottle. *Exhibit 23* at 1369-70.

198.    Jose Ramirez testified during Plaintiff Galvan's criminal trial and was subject to cross-examination by Plaintiff Galvan's criminal defense attorney Smeeton. *Exhibit 24* at GALVAN 1374-1417.

199.    Ramirez testified that he was with Rene Rodriguez and Frank Partida the morning of September 21, 1986 when he saw about four guys in an alley, walking towards Western. *Exhibit 24* at 1379: 16-22, 1380: 8-19, 1381: 1-16.

200.    Ramirez testified that he knew two of the individuals: Michael and John Galvan. Ramirez testified that the two other individuals never turned around for him to see their faces. *Exhibit 24* at 1382: 7-11, 1383: 12-16, 1384: 7-9.

201.    Ramirez testified that he knew Michael for "[a] couple of summers" but did not know his last name. *Exhibit 24* at 1388: 22-24, 1389: 1-7.

202.    Ramirez testified that he had known John Galvan since he was in grammar school and would see Galvan 2-3 times a day while in school. Ramirez also testified that John Galvan was from his neighborhood and he had spoken with Galvan about a hundred times. *Exhibit 24* at 1377: 15-20, 1378: 17-24, 1379: 3-12.

203.    Ramirez testified that Michael, John Galvan, and the two other individuals continued walking down the alley and he last saw the four individuals when they were in the middle of the alley. *Exhibit 24* at 1384: 10-14.

41

204.     Ramirez testified that he heard a woman screaming "my house is burning" and he ran towards the house that was on fire. *Exhibit 24* at 1385: 1-11.

205.     Ramirez testified that he spoke with detectives in the basement of the police station because he did not want anyone to see him at the police station. *Exhibit 24* at 1387: 1-15.

206.     Ramirez also testified that he viewed a line-up on June 8, 1987 and identified Michael and John Galvan. *Exhibit 24* at 1388: 3-15.

207.     Ramirez was asked about his interview with Jack King. Ramirez testified that he did not tell King the truth because he believed that King wouldn't bother him anymore if Ramirez told him that. Attorney Smeeton cross-examined Ramirez and mentioned the King interview. *Exhibit 24* at 1389: 8-22, 1390: 7-24, 1391: 1-7, 1413: 1-24, 1414: 1-8.

208.     Ramirez testified that he had consumed between two to three alcoholic beverages with Rodriguez prior to seeing the individuals in the alley. Ramirez denied being intoxicated from the alcohol and denied being high. *Exhibit 24* at 1401: 17-21, 1404: 24, 1405: 1-10, 14010: 13-21.

209.     Ramirez testified that he told police officers that he was in the alley before the fire started, that he observed four people in the alley, and recognized two of them and gave their names to the police officers. *Exhibit 24* at 1408: 7-24, 1409: 1-6.

210.     Raudel Casanova testified that he was a Chicago Fire Department firefighter and was injured while responding to the September 21, 1986 fire at 2603 W. 24th Place. *Exhibit 24* at 1419: 7-18, 1422: 12-23.

211.     During Galvan's criminal trial, Defendant Scheithauer testified as to his observations of the post-fire 2603 W. 24th Place. *Exhibit 24* at 1438.

212.     Defendant Scheithauer offered an opinion that, based upon the burning of the wood, the indication that something was laying on the surface of the floor that involved the wood to a greater

degree than the surrounding areas causing it to burn down and through the floor. He further testified that "[t]he significant is that something was obviously on that floor to the point where it got down into the floor and kept the heat such – at such a point that the floor itself became involved in the fire and eventually burned completely through at that section." *Exhibit 24* at 1441: 21-24, 1442: 1-6.

213.	Defendant Scheithauer testified that, during the course of his investigation, he collected a considerable amount of glass. He testified that some was clear glass that appeared to be from windows. Under questioning by Plaintiff Galvan's attorney, Defendant Scheithauer testified that he also recovered fragments of green glass from the first floor porch area several feet away from the rear doorway and not outside the building. *Exhibit 24* at 1443: 23-24, 1444: 1-4, 1469: 21-24, 1470: 1-12.

214.	Defendant Scheithauer testified that the Chicago Police Department crime lab analysis showed that the samples collected from the scene of the fire tested negative for the presence of accelerants. *Exhibit 24* at 1450: 8-23.

215.	Defendant Scheithauer testified to the following:

> I am of the opinion that the fire originated on the first floor rear porch at 2603 West 24th Place. The fire originated at or about floor level at a point approximately right around in the area of the doorway going into the first floor apartment.
>
> I am further of the opinion based on my evaluations and observations at the scene that the fire was propagated by means of a liquid accelerant and the ultimate ignition source at this time is unknown.

*Exhibit 24* at 1469: 5-16

216.	Defendant Scheithauer was cross-examined by Plaintiff's criminal defense attorney at the trial. *Exhibit 24* at 1469-1473.

217.    Under questioning by Plaintiff Galvan's attorney, Defendant Scheithauer testified that he believed the fire was a result of a liquid accelerant being introduced or applied to the surface of the rear porch floor and ignited. *Exhibit 24* at 1470: 13-22.

218.    The parties stipulated as to the death of Guadalupe and Julio Martinez. *Exhibit 25* at 1481-85.

219.    Defendant Switski testified that he interviewed Plaintiff Galvan with another officer at Area 4 and that Galvan made a statement concerning his involvement in the fire. *Exhibit 25* at 1495: 7-24.[15]

220.    Defendant Switski then testified as to the substance of the statement he said Galvan made and it went:

> Q.      What did he tell you?
> A.      He said that one the 21 of September, in 86, that he had been out on the 2600 block of 24th Street with a girlfriend, and it was in the early morning hours, and when he was sitting there with her and talking, two friends of his came up, who he said were Francisco Nanez and Arthur Almendarez.
> He says that they talked for a little while and during this conversation, the topic evolved around gangs, and mention was made that there were rival gang members living in the immediate area of 24th Street. And Mr. Galvan made mention that, in fact, he had been shot at by some rival gang members in the recent past.
> They eventually decided to set fire to the building which these rival gang members occupied which was on 24th Place, just west of Rockwell.
> He said that he stood – he stayed on the street as Francisco Nanez and Arthur Almendarez left, drove off in search of gasoline to start the fire. He said that they returned about ten minutes later and that they had a milk – plastic milk gallon full of gasoline. He says that the took the plastic milk carton and transferred some of the gasoline into a Miller's beer bottle, and then he, Arthur Almendarez, and Francisco Nanez walked to the rear of 2603 24th Place.
> When they got to that location, Mr. Nanez found a rag that had been thrown away, discarded in the alley, and he – picked up the rag and stuffed it into the bottle, the mouth of the bottle.

---

[15] The transcript states that Defendant Swtiski said Defendant Almanza was present during this interview but this appears to be an error as Defendant Switski does not believe Almanza was involved in this investigation, *Exhibit 10* at 354: 17-25, 355: 1-6, 356: 7-25, and Almanza denied being part in this investigation. **SOF** Number 140.

Mr. Galvan said he took a match and then lit the rag, and Mr. Nanez threw the bottle up against the back of the house, the rear porch. The bottle broke. The glass – or the liquid spilled over the back porch but didn't ignite.

Mr. Galvan said that he then took a lit cigarette and walked up to it and threw it onto the soaked wood, and it ignited, and once the fire started, that everyone ran. He, in particular, ran to 2617 West 24th Place – I am sorry, 24th Street, and he said that he stood out in front for a couple of minutes until he heard the fire equipment and what not arrive. He said a short time later, he went home.

*Exhibit 25* at GALVAN 1501: 6 – 1503: 1.

221. Defendant Leighton testified that he spoke with Plaintiff Galvan, who agreed to give a court reported statement. Defendant Leighton then authenticated the statement and a picture taken of Galvan following the statement. *Exhibit 25* at GALVAN 1526: 15-18, 1538: 13 – 1539: 19, 1549: 23 – 1550 : 6.

222. During cross-examination, Plaintiff Galvan's attorney questioned Defendant Leighton as to the differences between the oral statement and the court reported statement. *Exhibit 25* at GALVAN 1556-1559.

223. Defendant Leighton then read Plaintiff Galvan's June 8, 1987 court reported statement to the jury. *Exhibit 25* at GALVAN 1577: 15 – 1584: 8.

224. Plaintiff Galvan's attorney then sought permission to call Blanca Martinez during the defense case to question Blanca about her argument with Lisa Velez. The court denied the request. *Exhibit 25* at GALVAN 1588.

225. Carmer Baumgardner was called by Plaintiff Galvan's attorney. She testified that she was Galvan's grandmother and that Galvan arrived at her home at 3:00 AM on September 21, 1986 and was observed sleeping on the couch at 7:00 AM. *Exhibit 25* at GALVAN 1607: 5-22, 1609: 4-23.

226. Cynthia Montemayor was called by Plaintiff Galvan's attorney. She testified that Galvan arrived at their grandmother's house at 3:00 AM on September 21, 1987 and she observed Galvan sleeping on the couch when she heard sirens at approximately 5:00 AM. *Exhibit 25* at GALVAN 1618: 17-20, 1620: 2-19, 1621: 23-24, 1622: 13-23.

227. Plaintiff Galvan testified that he was told by Defendant Switski that he would get the death penalty if he did not confess and that Defendant Switski hit him several times in the back of the head. He testified that Defendant Switski went over a story that Galvan was to repeat to the assistant state's attorney. *Exhibit 25* at GALVAN 1655: 3-16, 1657: 10-16, 1695: 18-1696 : 20.

228. Diane Sanchez testified as a character witness for John Galvan. *Exhibit 26* at GALVAN 1731-1734.

229. Defendant Switski was recalled as a witness and denied committing any physical abuse against John Galvan. *Exhibit 26* at GALVAN 1742: 6-19.

230. During his closing argument, Plaintiff Galvan's attorney argued that Lisa Velez was the one who had threatened the Martinez family. *Exhibit 26* at GALVAN 1789.

231. Plaintiff Galvan was found guilty. *Exhibit 26* at GALVAN 1845: 1-14.

### Almendarez and Nañez criminal trials – January 1990

232. Plaintiffs Almendarez and Nañez were tried simultaneously but before separate juries. Their trials began on January 24, 1990. *Exhibits 27, 28, 29.*

233. Blanca Martinez testified in front of both juries. No cross-examination was performed by either Plaintiff Almendarez's or Plaintiff Nanez's attorneys. *Exhibit 27* at GALVAN 278: 19-22, 296.

234. Jorge Martinez testified in front of both juries but neither criminal defense attorney examined him. *Exhibit 27* at GALVAN 296, 304: 9-14.

235.    Soccoro Flores testified before both juries. She testified that she heard 2-3 voices coming from the alley outside her home at approximately 4:30 AM on September 21, 1986 and that she saw a male throw a bottle towards 2603 W. 24th Place and a fire started inside the porch area. *Exhibit 27* at GALVAN 306: 10-14, 307: 14-19, 308: 9-23, 309: 19-24, 310: 1-4, 311: 18-23, 312: 1-8.

236.    Soccoro Flores testified that she viewed a line-up but did not identify anyone as the person who threw the bottle. She was unable to identify the person who threw the bottle. *Exhibit 27* at GALVAN 312: 12-20, 314: 6-9.

237.    Soccoro Flores was subject to cross-examination by both criminal defense attorneys. *Exhibit 27* at GALVAN 317-322.

238.    Raudel Casanova testified before both juries. He was a Chicago Fire Department member who was injured while responding to the 2603 W. 24th Place fire. He was not subject to cross-examination. *Exhibit 27* at GALVAN 325: 1 - 327: 8, 336.

239.    Defendant Scheithauer provided testimony during the joint trial of Plaintiffs Nañez and Almendarez. Defendant Scheithauer testified to the following:

> Based upon my examination and observations made at the scene, I believe that the fire started on the first floor rear porch at or about floor level in the immediate vicinity of the floor beneath, or the base of the door leading to the first floor apartment.
> It is also my belief that the fire was propogated and spread by means of a liquid accelerant.

*Exhibit 27* at GALVAN 387-388

240.    Defendant Scheithauer testified that he ruled out all potential causes for the fire to have been accidental. *Exhibit 27* at GALVAN 357.

241.    Plaintiff Nañez's criminal defense attorney (Fletcher) was asked if he had any questions for cross-examination and Plaintiff Nañez's criminal defense attorney stated "No questions,

47

Judge." Plaintiff Almendarez's criminal defense attorney (Strunk) was asked if he had any questions for cross-examination and Plaintiff Almendarez's criminal defense attorney stated "Your Honor, we have no questions of the Detective." *Exhibit 27* at GALVAN 388.

242. During the Almendarez/Nañez trial, in front of both juries, Ramirez testified that he knew John Galvan from his grammar school. *Exhibit 28* at GALVAN 396, 397, 405-406.

243. During the Almendarez/Nañez trial, Ramirez testified that he was with Rodriguez from Saturday, September 20, 1986 through September 21, 1986. During that time, Ramirez consumed three beers. *Exhibit 28* at GALVAN 409-410.

244. During the Almendarez/Nañez trial, Ramirez testified that as he and Rodriguez were heading home, they encountered Partida. *Exhibit 28* at GALVAN 410-411.

245. During the Almendarez/Nañez trial, Ramirez testified that he observed four individuals in the alley between Luther and 24th Place. Ramirez testified that he recognized one of the individuals to be Michael and the other to be John Galvan but that the other two individuals did not turn around and he did not see their faces. *Exhibit 28* at GALVAN 411, 413-416.

246. During the Almendarez/Nañez trial, Ramirez testified that he only identified Michael and John Galvan during the June 8, 1987 lineup. *Exhibit 28* at GALVAN 422.

247. Under questioning by Plaintiff Nañez's criminal defense attorney Fletcher, Ramirez testified that he did not know Francisco Nañez. *Exhibit 28* at GALVAN 432.

248. Under questioning by Plaintiff Almendarez's criminal defense attorney Hill, Ramirez admitted that he knew Arthur Almendarez. *Exhibit 28* at GALVAN 435.

249. During the Almendarez/Nañez trial, Ramirez did not identify either Plaintiff Almendarez or Plaintiff Nañez as any of the individuals whom Ramirez testified he saw in the alley between Luther and 24th Place on September 21, 1986 prior to the fire. Ramirez also did not identify either

48

Plaintiff Almendarez or Plaintiff Nañez in the June 8, 1987 lineup. *Exhibit 28* at GALVAN 394-438

250.    William Walton testified before both juries. He testified that he was a cashier at the Martin gas station on 23rd and Western and that, on September 21, 1986, a Hispanic male purchased gasoline to be carried away in a milk container. Walton was unable to identify that individual. *Exhibit 28* at GALVAN 440, 442, 443, 447, 448.

251.    Chicago Police Officer Leonard Stocker testified before both juries and stated that he located Plaintiff Almendarez on June 8, 1987 at approximately 2:30 PM and transported him to Area 4. Stocker also testified that he located Plaintiff Nanez at approximately 4:30 PM on June 8, 1987 and transported him to Area 4. *Exhibit 28* at GALVAN 456-59.

252.    The parties stipulated as to the actions of the Cook County Medical Examiner. *Exhibit 28* at GALVAN 467-468.

253.    Defendant Hanrahan testified before the Almendarez jury. He testified that both he and Defendant Switski interviewed Plaintiff Almendarez on June 8, 1987 and testified that Almendarez had provided an oral statement in which he implicated himself in the 2603 W. 24th Place arson. *Exhibit 28* at GALVAN 478-79

254.    Defendant Hanrahan then testified as to the substance of the statement, which was the following:

> Q. Please relate to the ladies and gentlemen of the Jury what you said to him and what he said to you at that time.
> A. I told him that we were investigating a fire that occurred at 24th Place and Rockwell, where two people died. He indicated to us at that point that he was unaware of any fire that occurred in the last year in that area.
> At that point I told him that John Galvan was in the station and that we had already talked with John Galvan.
> Q. After you confronted the Defendant with the fact that John Galvan was in the station and that you had spoken with him, did he say anything?
> A. Yes, he did.

49

> Q. What did he tell you?
> A. At that point he said that he was present for the fire and that prior to the fire he was in the company of John Galvan and Francisco Nanez in the twenty-six hundred block of 24th Street, and while there John Galvan had told them that he was having problems with some
> rival gang members who were living in the area and that they were living in the area of 24th and Rockwell and he wanted to burn the house down.
> At that point the three of them went to 23rd and Western which is a gas station, a Martin's gas station and John Galvan had an empty milk container and the Defendant pumped the gas into the carton.
> At that point they went to the area of the fire. He said he stood approximately twenty feet from the house and that Galvan and Nanez approached the house. He stated the next thing that he recalls was Galvan and Nanez running past him and telling him to run, which he did. He stated that he ran home and stayed there for the rest of evening.

*Exhibit* 28 at GALVAN 480, 481, 482.

255. Michael Almendarez testified before the Nanez jury. He testified that he denied telling any police officer that Galvan and Nanez had confessed to him in October 1986 as to the role in the 2603 W. 24th Place arson. *Exhibit* 28 at GALVAN 512-519.

256. The trial ASA then showed Michael Almendarez his June 9, 1987 statement and asked questions about the contents of the statement. The prosecutor used a transcript of the June 13, 1988 hearing during this examination. *Exhibit* 28 at GALVAN 521-24.

257. During cross-examination, Michael testified that police officers had hit and threatened him prior to the statement being signed. *Exhibit* 28 at GALVAN 533.

258. Defendant Switski testified before the Nanez jury. He testified that he and Defendant Hanrahan had interviewed Nanez at Area 4 at approximately 5:30 PM on June 8, 1987. *Exhibit 29* at GALVAN 553-554.

259. Defendant Switski testified that Plaintiff Nanez had made an incriminating statement and testified as the substance of the statement, which was:

> Q. (Continuing by Mr. Kelly) After you told the Defendant those things, what did he tell you?

50

A. Well, after a few seconds, he paused for a while and then he said that he had knowledge of

the fire. He said that on the 21st of September in '86, he was out on the twenty-six hundred block of 24th Street with some friends talking. He said that those friends would be John Galvan and Arthur Almanderez.

He said that during the conversation that John Galvan mentioned to the other two that he had had

some problems with an area resident and that he wanted to go and burn this person's residence.

Mr. Nanez said that when he initially heard this, he was reluctant to participate in this, he says,

but with some coaxing from Almanderez and Galvan, he agreed to go and participate.

Q. Did he tell you anything else?

A. Yes. He said that the three of them, Almanderez, Galvan, and himself Nanez, left in

Almanderez' car with Arthur Almanderez driving. Galvan and Nanez as passengers and went to    23rd and Western to a Martin Gas Station. He said that once they arrived there, Mr. Almanderez paid the gas station attendant for some gas and Mr, Galvan pumped a small quantity of gas into an

empty milk carton, plastic milk carton.

He said that after that they left the gas station and they went to 22nd and Washtenaw where they

parked the car and began to walk southbound on Washtenaw.

While walking southbound on Washtenaw, he said that he found a discarded empty glass bottle. He said we then put the gasoline from the milk carton into the bottle. What gasoline they could fit into the bottle, and then continued walking southbound.

He said they eventually came to the rear of 2603 - 24th Place, and upon reaching that address,

Mr. Galvan went to the rear of the building with the plastic milk carton which still contained a quantity of gasoline and he splashed the gas onto the rear of the house. After that, Galvan stepped back into the alley and Mr. Nanez said that either Galvan or Almanderez, he couldn't remember which of the two, took a rag from the ground in the alley and stuffed it  into the mouth of the glass bottle which contained the gasoline.

He said Galvan then asked him for a light. He said then he saw Galvan light the bottle and throw it through the rear window of the building, and he said immediately a fire ensued, at which time

Mr. Nanez said that he ran back out onto 24th Street.

After staying there a short time, he eventually wandered back out to the front of 2603 West 24th Place where he watched the fire.

*Exhibit* 29 at GALVAN 560-562.

51

260.    Defendant Leighton testified before the Nanez jury and authenticated the Nanez court reported statement and June 8, 1987 photograph. *Exhibit* 29 at GALVAN 594-596.

261.    Defendant Leighton then authenticated the Michael Almendarez handwritten statement. *Exhibit* 29 at GALVAN 602-603.

262.    ASA Leighton then read the Nanez June 8, 1987 court reported statement to the jury. *Exhibit* 29 at GALVAN 655-665.

263.    ASA Leighton testified before the Almendarez jury and authenticated the June 8, 1987 handwritten statement that Plaintiff Almendarez signed. *Exhibit* 29 at GALVAN 706: 3-22.

264.    Defendant Leighton then read the Arthur Almendarez June 8, 1987 handwritten statement to the jury. *Exhibit* 29 at GALVAN 723.

265.    During his closing argument, Plaintiff Nanez's criminal defense attorney commented on Michael Almendarez's claimed lies and pointed out the differences between his in-court testimony and his June 9, 1987 handwritten statement. *Exhibit 52* at GALVAN 793: 2-24, 794: 1-24, 797: 1-11.

266.    Plaintiff Nanez was found guilty. *Exhibit 52* at GALVAN 1005: 14-24, 1006: 1-9.

267.    In the Almendarez proceeding, the parties stipulated that Officer Centracchio, if called to testify, would testify consistently with his September 21, 1986 report of Soccoro Flores' interview. Defendant Centracchio did not testify. *Exhibit 52* at GALVAN 901: 16-23.

268.    In the Almendarez proceeding, the parties stipulated that, if called to testify, Defendant Hanrahan would testify that Soccoro Flores had viewed a photo array and stated that Isaac Galvan appeared similar to the man she observed in the alley on September 21, 1987. *Exhibit 52* at GALVAN 902: 1-8.

269.    Plaintiff Almendarez was found guilty. *Exhibit 52* at GALVAN 995: 9-24, 996: 1-7.

270. Plaintiffs Galvan and Almendarez filed post-conviction petitions. Assistant State's Attorney Michael McCormick was assigned to represent the state in the proceeding for approximately ten years. *Exhibit 18* at 13: 12-24.

271. The third stage hearings occurred in 2015 and 2016 but ASA McCormick was no longer on the case as the State was considering calling him as a witness. *Exhibit 18* at 18: 2-9.

272. On November 15, 2005, ASA McCormick interviewed Plaintiff Nanez. *Exhibit 18* at 51: 22-24, 52: 1-3.

273. ASA McCormick testified that he asked Plaintiff Nanez "did you guys do this?" According to ASA McCormick, Plaintiff Nanez said "yes, we did." *Exhibit 18* at 57: 4-20.

274. On July 21, 2022, the criminal charges were dismissed against Plaintiff Nanez, Plaintiff Galvan, and Plaintiff Almendarez. *Exhibit 33* at GALVAN 4793-4794, *Exhibit 34* at GALVAN 4974-4975; *Exhibit 35* at GALVAN 4617, 4618.

## CIVIL ACTION

275. Rene Rodriguez is deceased. *Exhibit 15* at 210: 13-15.

276. Jose Ramirez is deceased. *Exhibit 15* at 212: 1-5.

277. In their answers to Defendants interrogatories, Plaintiffs all answered that their due process claim is based upon: a false, coerced statement from Michael Almendarez; a conspiracy to fabricate police reports and manipulate statements from Jose Ramirez and Rene Rodriguez and withheld knowledge that these two witnesses did not have reliable information about the crime; "rigged" out of court identifications and lineups of Plaintiff Galvan by Jose Ramirez; fabricated and coerced statements from each of the three Plaintiffs, including Nañez who was intoxicated; knowingly or recklessly manufactured "false" evidence of arson in that the following four facts were false (1) that the fire initiated on the first-floor back porch, (2) that the

fire could have been ignited with a lit cigarette, (3) that the amount of gasoline that a small bottle could contain could have caused the fire in question, and (4) that there was any evidence that the fire was intentionally set; withheld evidence from the crime lab that the green glass was "not likely a beer bottle" and that the City's crime lab determined there was no evidence of an accelerant; and withheld the fact that Jessie Alva drove a red vehicle. *Exhibits 37* at Interrogatory Answer Number 15; *Exhibits 38* at Interrogatory Answer Number 15; *Exhibits 39* at Interrogatory Answer Number 15.

278.    In their operating complaints, each Plaintiff alleges that ASA Leighton was informed by Plaintiffs Galvan and Almendarez that they had been abused by police officers. Plaintiffs also allege that Plaintiff Nañez was obviously intoxicated. *John Galvan First Amended Complaint* (23-cv-3158, *Dkt. No. 189)* at ¶¶ 64, 70, 73, 74; *Francisco Nañez First Amended Complaint* (23-cv-3162 *Dkt. No. 122*) at ¶¶ 57, 63, 75, 82; *Arthur Almendarez Second Amended Complaint* (23-cv-3165 *Dkt. No. 121*) at ¶¶ 58, 78, 79, 83, 85.

279.    On November 15, 2024, Plaintiffs filed a motion seeking to add Alan Osoba as a defendant. *Galvan 23-cv-3158 Dkt. No. 171; Nañez 23-cv-3162 Dkt. No. 115; Almendarez 23-cv-3165 Dkt. No. 118.*

280.    Until shortly before his November 7, 2024 deposition, Defendant Osoba had no knowledge that Plaintiffs had filed their lawsuits. *Exhibit 60* (*Affidavit of Alan Osoba*) at ¶ 6.

281.    At no time prior to his deposition was Defendant Osoba aware that he could have or should have been named as a defendant in the current lawsuits. *Exhibit 60* at ¶ 7.

282.    Defendant Osoba did not become aware that Plaintiffs were seeking to add him as a defendant in the current lawsuits until after Plaintiffs had filed their motions seeking leave to add Defendant Osoba as a named party. *Exhibit 60* at ¶ 8.

283.     Plaintiffs were taken to their first court appearance on June 9, 1987 and ordered

committed to the Cook County Department of Corrections, with bail set. *Exhibit 63 (Galvan*

*June 9, 1987 order); Exhibit 64 (Almendarez June 9, 1987 order); Exhibit 65(Nañez June 9,*

*1987 order).*


                                        Respectfully submitted,


                                        /s/ *Shawn W. Barnett*
                                        Special Assistant Corporation Counsel
                                        One of the attorneys for the Defendant Officers


Andrew M. Hale (ahale@halemonico.com)
Kelly M. Olivier (kolivier@halemonico.com)
Brian Stefanich (bstefanich@halemonico.com)
Shawn Barnett (sbarnett@halemonico.com)
Hannah Beswick-Hale (hannah@halemonico.com)
Hale & Monico LLC
53 W. Jackson Blvd., Suite 334
Chicago, IL 60604
T: (312) 870-6908

## CERTIFICATE OF SERVICE

I, the undersigned attorney, certify that I caused the foregoing to be filed with the Court using the Court's electronic filing system. As a result, copies of the filed document were electronically served upon all counsel of record.


*/s/ Shawn W. Barnett*